IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JACOB BRANSON DAVIS,                )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        1:15CV362
                                    )
WILLIAM CHARLES BLANCHARD, in       )
his individual and official         )
capacities; THE GUILFORD COUNTY     )
BOARD OF EDUCATION; CRANDALL        )
FRANCES CLOSE, in her               )
individual and official             )
capacities; and THE STATE OF        )
NORTH CAROLINA,                     )
                                    )
                Defendants.         )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

This matter comes before the court on the motion to dismiss Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) filed by Defendants The Guilford County Board of Education ("Board") and William Charles Blanchard, in his individual and official capacities, ("Blanchard") (collectively "Defendants"). (Doc. 6.) Plaintiff Jacob Branson Davis ("Plaintiff") filed a response in opposition to this motion to dismiss, (Doc. 21), and Defendants subsequently filed a reply (Doc. 23). This matter is ripe for resolution and for the following reasons, this court will grant in part and deny in part Defendants' motion to dismiss.

# I.  <u>LEGAL STANDARD OF REVIEW</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). When ruling on a motion to dismiss, a court must accept the complaint's factual allegations as true. <u>Id.</u> Further, "the complaint, including all reasonable inferences therefrom, [is] liberally construed in the plaintiff's favor." <u>Estate of Williams-Moore v. All. One Receivables Mgmt., Inc.</u>, 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted).

Nevertheless, sufficient factual allegations must "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." <u>Twombly</u>, 500 U.S. at 555, 570; see <u>Iqbal</u>, 556 U.S. at 680. A court cannot "ignore a clear failure in the pleadings to allege any facts which set forth a claim." <u>Estate of Williams-Moore</u>, 335 F. Supp. 2d at 646. Consequently, even given the deferential standard allocated to pleadings at the motion to dismiss stage,

-2-

a court will not accept mere legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678.

Further, courts "should dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) if the complaint fails to allege facts upon which subject matter jurisdiction can be based or if jurisdictional allegations in the complaint are not true." McLaughlin v. Safway Servs., LLC, 429 F. App'x 347, 348 (4th Cir. 2011) (per curiam) (citation omitted); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982) (outlining two ways lack of subject matter jurisdiction arises: failure "to allege facts upon which subject matter jurisdiction can be based" and when "the jurisdictional allegations of the complaint were not true"). A challenged plaintiff "bears the burden of persuasion" in defending subject-matter jurisdiction. Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995).

## II.  **FACTUAL BACKGROUND**

Consequently, the following facts are drawn from the Complaint (Complaint ("Compl.") (Doc. 3)) and are presented in the light most favorable to Plaintiff. See Iqbal, 556 U.S. at 678.

**A.** <u>**Events Leading to April 29, 2010**</u>

Plaintiff, a minor at the time of the events in question, (Compl. (Doc. 3) ¶¶ 17-18), attended Southeast Guilford High School during the 2009-2010 school year. (<u>Id.</u> ¶ 55.) Blanchard was principal of Southeast Guilford High School at that time. (<u>Id.</u> ¶ 23.) Plaintiff, who was identified as learning disabled, had an Individualized Educational Plan ("IEP"), pursuant to the Individuals with Disabilities Act, that was implemented no later than September 4, 2009. (<u>Id.</u> ¶¶ 56-57.) Prior to the events at issue, the last review of his IEP occurred on March 29, 2010. (<u>Id.</u> ¶ 58.)

Plaintiff's mother reported to a teacher that another student, Matthew Cagle, was verbally harassing Plaintiff on a daily basis. (<u>Id.</u> ¶ 59.) She made this report in either late January or early February 2010. (<u>Id.</u>) The teacher then, despite Plaintiff's mother's objection to this arrangement, had Plaintiff and Cagle sit next to each other when in her classroom. (<u>Id.</u> ¶ 60.) Plaintiff further alleges that after this change occurred, the taunting increased until, one afternoon, Cagle punched Plaintiff and then ran to his bus. (<u>Id.</u> ¶ 61.) The next day, Plaintiff hit Cagle in retaliation for the previous afternoon and then ran to his own bus. (<u>Id.</u> ¶ 62.) No disciplinary action is alleged regarding either of these

-4-

physical incidents. There is also no allegation of any further disruption between Cagle and Plaintiff.

Also in the second semester, Plaintiff enrolled in the Advanced PE class taught by Coach White. (Id. ¶ 63.) Dennis Ray Covington Jr. was also enrolled in this class. (Id. ¶ 64.) Plaintiff alleges that Covington and his friends taunted Plaintiff during that semester and called him offensive names. (Id. ¶ 65.) Throughout this period, Plaintiff alleges that he rarely saw any school personnel in the boys' locker room, as adult contact was limited to when coaches leaned their heads in and informed students that class was nearly over. (Id. ¶ 67.)

On April 28, 2010, Covington accused Plaintiff of calling him a "[racial epithet]," but Plaintiff denied this accusation. (Id. ¶ 66.) This interaction led to the April 29, 2010 assault that is the foundation of this suit.

**B.  April 29, 2010**

At approximately 1:30 p.m., April 29, 2010, Plaintiff was in the boys' locker room, changing clothes at the end of his Advanced PE class. (Id. ¶ 69.) No school employees were present in the locker room at this time. (Id. ¶ 77.) While Plaintiff was bent over and leaning into a lower locker to retrieve his clothing, leaving the open locker door on his right side, Covington approached his left side and Covington's friend, Brandon Jacobi South, stood behind Plaintiff. (Id. ¶ 70.)

-5-

Covington asked Plaintiff, "Who you calling a [racial epithet]?" and Plaintiff replied, "I don't know what you're talking about." (Id. ¶¶ 71-72.) At that point, Covington began repeatedly punching Plaintiff in the face and head as Plaintiff tried unsuccessfully to escape. (Id. ¶¶ 73-74.) Finally, Plaintiff got up and pushed past Covington, who continued to beat him in the back of the head as Plaintiff ran to the door and out of the locker room. (Id. ¶¶ 75-76.) No school employers were close enough to the locker room to hear the attack or the commotion or to see Plaintiff come into the hallway. (Id. ¶ 78.)

Plaintiff then ran down the hallway to an office where Coaches Fritz, Coble, and White were located. (Id. ¶ 79.) As Plaintiff's nose and mouth were bleeding profusely, a coach asked, "Dear God what has happened?" (Id. ¶¶ 80—81.) Unable to speak because of the injuries he sustained in the attack, Plaintiff pointed towards the locker room in response. (Id. ¶ 82.) Coach White rendered some medical aid to Plaintiff, stuffing gauze into his nose to help stop the bleeding. (Id. ¶ 83.) Then, Coach White took Plaintiff to Principal Blanchard's office. (Id.)

C. **Initial Response to the Assault**

Coach White, who had taken Plaintiff to the principal's office, spoke with Blanchard about what had happened. (Id. ¶ 85.) Then, Blanchard called Plaintiff's mother to notify her of

-6-

what had happened. (Id. ¶ 86.) However, he did not notify local law enforcement of the assault. (Id. ¶ 89.)

Blanchard moved Plaintiff into his personal office area to wait for his mother, while Blanchard returned to the outer office area. (Id. ¶ 88.) Plaintiff's mother arrived at approximately 3:30 p.m., entered the office, and briefly spoke with Blanchard. (Id. ¶¶ 90-91.) At this point, Plaintiff was still bleeding from his nose and mouth. (Id. ¶ 92.) His mother said she wanted charges filed against Covington for the assault and then she took Plaintiff out of the office. (Id. ¶¶ 93-94.)

Plaintiff and his mother went to the nearest emergency room for treatment. (Id. ¶ 94.) On the ride, Plaintiff used a sixteen-ounce cup to catch the blood from his nose and mouth. (Id. ¶ 95.) It was nearly full by 3:56 p.m., when they arrived at the hospital. (Id. ¶¶ 95-96.) At the hospital, Plaintiff was diagnosed with a fractured left nasal bone, a fractured right nasal bone, and several broken teeth. (Id. ¶¶ 97, 99.) He was told surgery would be required and was given pain medication in the interim. (Id. ¶ 98.) He was then discharged from the hospital at 5:26 p.m. and his mother promptly, at 5:59 p.m., reported the physical assault to the Guilford County Sheriff's Department. (Id. ¶¶ 100-01.)

Guilford County Sheriff's Department officers met with Plaintiff and his mother to take a report, which described the

-7-

offense as an assault with serious injury or deadly weapon, perpetrated by Covington on Plaintiff. (Id. ¶¶ 102-03.)

Despite never asking Plaintiff what occurred in the locker room, Blanchard prepared a Memorandum of Disciplinary Action outlining disciplinary action to be taken against Plaintiff as a result of the assault. (Id. ¶¶ 104-05.) No incident number was assigned to the assault on this memorandum and there was no incident report filed with the Board. (Id. ¶¶ 106-07.) The memorandum also failed to show that Plaintiff was in a program for exceptional children and that he had an EC classification. (Id. ¶¶ 108-09.)

As punishment, Plaintiff received a short-term five-day suspension, the maximum recommended punishment, from April 29 to May 5, 2010, for violating Rule 8 of the school's code of conduct. (Id. ¶¶ 110-11.) Blanchard premised this punishment on Plaintiff "[c]ontinuously using racial slurs . . . to other students in his Advanced PE class. This created a major disturbance in the locker room resulting in him being attacked." (Id. ¶ 112.) Significantly, Plaintiff alleges two key facts: first that he was not asked whether or not he had made this statement, (id. ¶ 226), and second that Covington admitted during his subsequent criminal trial that Plaintiff had not made this statement, (id. ¶ 227). Despite Blanchard indicating on the memorandum that Plaintiff's parent had both been contacted by

-8-

phone regarding the disciplinary action and participated in a conference about it, Plaintiff alleges that no conference was held with his mother on April 29, 2010, regarding this disciplinary action. (Id. ¶¶ 113-14.) Further, Plaintiff alleges that on the day of the assault, his mother was at the school for less than ten minutes and, while there, she spoke briefly with Blanchard about the injuries and indicated that she wanted criminal charges filed. (Id. ¶¶ 115-16.)

Covington received the same five-day suspension as Plaintiff, even though the school's code of conduct recommends a minimum ten-day suspension for a violent physical assault upon a student resulting in injury. (Id. ¶¶ 117-18.)

### D. Later Events Responding to the Assault

Plaintiff's mother called Blanchard on April 30, 2010, and subsequently several more times, to schedule a meeting to discuss filing criminal charges against Covington and ensuring Plaintiff's safety when he returned to school. (Id. ¶¶ 120-22.) Blanchard did not return her calls until after she stated that she would contact the Board if he did not meet with her. (Id. ¶¶ 121-22.) A meeting occurred on May 12, 2010, and included Plaintiff, his mother, Blanchard, Plaintiff's sister and her fiancé, and Matthew Suites, the school resource officer. (Id. ¶ 124.) Notably, Plaintiff's IEP team was not present at this meeting and thus did not make any determination regarding

-9-

homebound instruction's status as the least restrictive environment for Plaintiff. (<u>Id.</u> ¶¶ 130-32.)

At that meeting, Plaintiff's mother repeated her request that charges be filed against Covington. (<u>Id.</u> ¶ 125.) Blanchard informed her that, because the assault occurred on school property, she was not allowed to file charges and only the school could do so. (<u>Id.</u> ¶ 126.) Then, they discussed whether Plaintiff should return to Southeastern Guilford for the remainder of that school year. (<u>Id.</u> ¶ 127.) Blanchard very strongly recommended that Plaintiff's mother ensure that Plaintiff did not return to the school that year, as it was likely he would encounter future problems with Covington. (<u>Id.</u> ¶ 128.) The group decided that Plaintiff would request to be on homebound instruction for the remainder of the year, resulting in him not being allowed to participate in school activities for the remainder of the year despite his prior activity in these activities. (<u>Id.</u> ¶¶ 129, 133-34.) Plaintiff made only one return to campus, to take a test, and was teased by a student while there. (<u>Id.</u> ¶¶ 135-36.)

Despite repeated requests by Plaintiff's mother, Blanchard still would not press criminal charges against Covington. (<u>Id.</u> ¶ 137.) Consequently, in early June 2010, Plaintiff's mother asked the Guilford County Sheriff's Department to press charges. (<u>Id.</u> ¶ 138.) Plaintiff alleges that Blanchard, in retaliation

-10-

for this request, initiated the process of charging Plaintiff with Disorderly Conduct by Fighting. (Id. ¶ 139.) Plaintiff alleges that these actions were intended to keep Plaintiff from pursuing redress for the damages he suffered during the assault and to prevent Blanchard and the Board from incurring liability for mistakes made when investigating and responding to the assault. (Id. ¶ 143.)

The Board's liability insurer contacted Plaintiff's mother on or about June 8, 2010, to offer $150,000.00 to settle all claims and assured her that Blanchard would be "let go." (Id. ¶¶ 140-41.) She denied the offer. (Id. ¶ 141.) Blanchard remained Principal of Southeast Guilford, (id. ¶ 142), and on October 12, 2010, Blanchard was chosen as a finalist for the Board's 2010 Principal of the Year award. (Id. ¶ 166.) In June 2013, Blanchard left this position for a job as principal of a high school outside of Guilford County. (Id. ¶ 172.)

Following intervening criminal prosecution and ultimate dismissal of the disorderly conduct by fighting charge, (id. ¶¶ 145-169), Plaintiff and his mother filed civil suits against Defendants. (See id. ¶¶ 171-83.)

## III. **ANALYSIS**

On June 11, 2015, Defendants Board and Blanchard filed a motion to dismiss Plaintiff's state constitutional claims, Americans with Disabilities Act ("ADA") claims, and punitive

-11-

damages request under Rules 12(b)(1) and (6) of the Federal
Rules of Civil Procedure. (Motion to Dismiss ("Mot. to Dismiss")
(Doc. 6) at 1.) Specifically, they assert that Count One is
insufficient under 12(b)(6), that Counts Four and Five are
insufficient under 12(b)(1) and (6), as being filed outside of
the statute of limitations and the time to file an actionable
claim under the ADA, and that Plaintiff's request for punitive
damages is improper under 12(b)(1) because these damages are not
available against governmental entities. (Id. at 2.)

### A.   North Carolina Constitutional Claims

Plaintiff's first claim is entitled "Deprivation of
Opportunity to Receive a Sound Basic Education as Guaranteed by
the North Carolina Constitution, Article I, Section 15, and
Article IX, Section 2." (Compl. (Doc. 3) at 16.)

Defendants provide a two-pronged argument to dismiss: (1)
because this is not a cognizable claim, Plaintiff failed to
state a claim, and (2) Plaintiff has adequate state remedies
available to him. (See Memorandum in Support of Motion to
Dismiss ("Mem. in Supp.") (Doc. 7) at 9.)

First, Defendants emphasize the novelty of this claim,
arguing that, unlike the right to a sound basic education, there
is no legal precedent supporting a private right of action for
personal injuries or for monetary damages based on these
provisions. (See id. at 5-7 (citing Leandro v. State, 346 N.C.

-12-

336, 347, 488 S.E.2d 249, 255 (1997)).) They distinguish a key
case for Plaintiff, Craig v. New Hanover County Board of
Education, 363 N.C. 334, 678 S.E.2d 351 (2009), as not providing
an avenue for Plaintiff's claim and instead having simply
"opined on a basic premise that a plaintiff without any
available remedy due to the defense of sovereign immunity may
assert a colorable, constitutional claim." (Mem. in Supp. (Doc.
7) at 7 (citing Craig, 363 N.C. at 340, 678 S.E.2d at 355).) In
other words, Craig simply held in the abstract that sovereign
immunity's prohibitive impact on common law claims did not
extend so far as to prevent plaintiffs from bringing
constitutional claims they may have otherwise been able to
bring, without actually addressing the merit of the claims
there. (Id. at 7-8 (citing Craig, 363 N.C. at 340, 678 S.E.2d at
355; Doe v. Charlotte-Mecklenburg Bd. of Educ., 222 N.C. App.
359, 367-68, 731 S.E.2d 245, 252 (2012)).) Consequently,
relevant decisions have simply addressed the nature, extent, and
quality of opportunities available in the public schools, not
the individualized private right of action Plaintiff proposes.
(Id. at 8.) Illustratively, Defendants further point to several
decisions "within North Carolina in cases where the plaintiff
alleged he was denied the right to an education after being
injured in the school environment," where the constitutional
claims were dismissed. (Id. at 8-9.)

-13-

Defendants emphasize that Plaintiff's citations to statutes to assert a heighted negligence standard do not support his constitutional claim because such a claim has not been recognized under these constitutional provisions. (<u>Id.</u> at 10.)

As for available alternative state remedies, Defendants emphasize that Blanchard allegedly violated laws that provide a private cause of action if, as alleged, he "illegally changed the Plaintiff's educational placement," (<u>id.</u> at 10-12 (noting also that Plaintiff has failed to meet the one-year statute of limitations for these laws)), and that the other allegations are intentional torts, for which Plaintiff would have a state avenue for relief, (<u>id.</u> at 12). In sum, "[t]hese available remedies are sufficient enough to preclude any constitutional claim." (<u>Id.</u> at 13.)

In response, Plaintiff points to precedent establishing the North Carolina Constitution's guarantee of the opportunity to a sound basic education. (Brief in Opposition to Motion to Dismiss ("Br. in Opp'n") (Doc. 21) at 2-3.) He argues that <u>Craig</u> establishes this guarantee as a "personal and individual right." (<u>Id.</u> at 3 (citing <u>Craig</u>, 363 N.C. at 338-40, 678 S.E.2d at 354-55).) Emphasizing the non-exclusive list of factors the North Carolina Supreme Court provided as a way to evaluate whether this guarantee has been violated, (<u>see</u> <u>id.</u> at 3-4 (citing

-14-

<u>Leandro</u>, 346 N.C. 336, 355-56, 488 S.E.2d 249, 259-60 (1997))),[1]
Plaintiff contends that the facts he alleges — inadequate
supervision, an assault by a fellow student, a subpar response
by the school, and disciplinary actions against him, resulting
in him not returning to the school — sufficiently "directly
relate[] to the nature, extent, and quality of the educational
opportunities made available to [him] while he was a student" to
support his right of action. (<u>Id.</u> at 4.)

As to whether such a right even exists, Plaintiff argues
that such a right unquestionably exists, given that the North
Carolina Supreme Court both (1) held that such a right exists
and (2) gave a factorial framework to help analyze if violations
have occurred. (<u>Id.</u> at 4-5.) He argues that there must be a
remedy when the right is infringed upon, otherwise the
educational guarantee would be meaningless. (<u>Id.</u>) Consequently,
a private right of action does and must exist. (<u>Id.</u> at 5.)

In contrast to Defendants' case illustrations, Plaintiff
asserts that allegations based on this right have been allowed
to proceed, citing <u>Doe</u> as an example. (<u>Id.</u>) However, he concedes

---

[1] These factors included: " '[e]ducational goals and
standards adopted by the legislature,' 'performance . . . on
standard achievement tests,' 'level of . . . general educational
expenditures and per-pupil expenditures,' and 'other  factors
which may be relevant for consideration in appropriate
circumstances when determining educational adequacy issues under
the North Carolina Constitution.' " (Br. in Opp'n (Doc. 21) at 4
(citing <u>Leandro</u>, 346 N.C. at 355-56, 488 S.E.2d at 259-60).)

that "where the course of conduct alleged to be in violation of
this right was limited to a single physical altercation, sexual
abuse by another student, and sexual abuse by a teacher," the
allegations were insufficient to allege a violation of
educational guarantee. (Id. at 5-6 (citations omitted).)
Instead, Plaintiff seeks to distinguish his allegations, arguing
that his "case involves allegations of a prolonged, retaliatory
course of conduct by Blanchard[,]" "a public official clothed
with the authority of the state," making his "acts . . .
effectively the actions of the state itself" and thus capable of
having "violated the fundamental right of a citizen as
guaranteed by the North Carolina Constitution." (Id. at 6.)

Plaintiff's argument rests on bullying by a peer and
allegedly harassing actions by a public official. (Id. at 7-8.)
He draws on federal precedent that peer-based harassment can, in
some cases, keep a victim from having access to educational
opportunities, (id. at 6-7 (citing Davis v. Monroe Cty. Bd. of
Educ., 526 U.S. 629, 633 (1999); Jennings v. Univ. of N.C., 482
F.3d 686 (4th Cir. 2007))), and then matches this with the North
Carolina statutory duty for schools to keep schools bullying-
and harassment-free, (id. at 7 (citation omitted)).

Having argued that the right exists and can be pursued in a
private right of action, Plaintiff reminds the court that it is
a fundamental right and thus Defendants must satisfy strict

-16-

scrutiny. (Id. at 8-9 (citations omitted) (arguing instead that preventing this conduct would serve a compelling government interest).) As to whether he would be entitled to declaratory, versus monetary, relief for the alleged violations, Plaintiff rests upon the court's remedial discretion. (Id. at 9.)

As to the question of available alternate remedies, Plaintiff argues that, because Blanchard cannot be held liable for mere negligence in his positon, there is no adequate remedy at state law. (Id. at 9-10.) Somewhat in the alternative, he also contends (1) that the Board and Blanchard waived sovereign liability, to a degree, by purchasing insurance, and (2) that intentional or reckless behavior would not be covered by immunity. (Id. at 10 (arguing further factual determinations would be necessary).)

Defendants filed a short reply that argues: (1) no such claim does, or has ever, existed under the state constitution, (Reply Brief ("Reply Br.") (Doc. 23) at 1-5),[2] and (2) "Plaintiff cannot argue he is denied the ability to bring state law claims and at the same time plead state law claims," (id. at 4 (emphasis removed)). They reiterate that he cannot sue directly

---

[2] Defendants further assert that Plaintiff's claims do not present any meaningful factual distinction when compared to numerous previous cases in this area. (Reply Br. (Doc. 23) at 4-5 ("Plaintiff's constitutional tort, or Leandro claim, is not unique and presents no real factual or legal issues different than the numerous plaintiffs before him.").)

under the state constitution and, at least at one point,
Plaintiff had adequate alternative remedies available to him.
(Id. at 1.) Defendants repeatedly assert that "there is little
confusion" over these issues, citing a number of cases in
support of the contention that such a private right of action
simply does not exist. (Id. at 2-3 (citations omitted).)

Defendants further accuse Plaintiff of seeking to confuse
the issue and assert that immunity denied him alternative
adequate state remedies. (Id. (citing Craig v. New Hanover Cty.
Bd. of Educ., 363 N.C. 334, 678 S.E.2d 351 (2009); Corum v.
Univ. of N.C., 330 N.C. 761, 413 S.E.2d 276 (1992)).) However,
they argue that several claims were available from his
allegations under his constitutional claims and thus sufficient
alternatives "preclude any constitutional claim." (Id. (focusing
on malicious prosecution and intentional infliction of emotional
distress).) Defendants accuse Plaintiff of not pursuing
legitimate claims that could have provided an adequate
alternative remedy because he instead focused on an illusory
state constitutional action. (Id. at 3-4.)

First, the North Carolina Constitution provides in article
I, section 15: "The people have a right to the privilege of
education, and it is the duty of the State to guard and maintain
that right." N.C. Const. art. I, § 15. Article IX, section 2,

provides for a "[u]niform system of schools," specifically

stating:

> (1) General and uniform system: term. The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.

> (2) Local responsibility. The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate. The governing boards of units of local government with financial responsibility for public education may use local revenues to add to or supplement any public school or post-secondary school program.

N.C. Const. art. IX, § 2.

Leandro v. State, 346 N.C. 336, 488 S.E.2d 249 (1997),

delivers the seminal analysis of these provisions. The key

question was "whether the state is required to provide children

with an education that meets some minimum standard of quality."

Id. at 345, 488 S.E.2d at 254. Significantly, Leandro focused

on generalized funding issues, rather than individual concerns,

as plaintiffs argued that inequities between wealthy and poor

school districts violated the students' right to equal

educational opportunities. Id. at 342-43, 488 S.E.2d at 252-53.

The North Carolina Supreme Court "conclude[d] that the right to

education provided in the state constitution [in article I,

-19-

section 15, and article IX, section 2] is a right to a sound basic education." Id. at 345, 347, 488 S.E.2d at 254.[3]

The court illuminated the "qualitative standard inherent in th[is] [constitutional] right." Id. at 346, 488 S.E.2d at 254. A "sound basic education" is

> one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

---

[3] Hoke County Board of Education v. State, 358 N.C. 605, 99 S.E.2d 365 (2004), establishes all students' right to this education. Id. at 620, 599 S.E.2d at 379 (focusing on a county-wide question of whether the students had been granted their constitutional right to a sound basic education (Id. at 610, 599 S.E.2d at 373-74)).

Id. at 347, 488 S.E.2d at 255 (citations omitted).[4] However, while a sound basic education is a constitutional requirement, the North Carolina Constitution does not provide for equality of educational opportunity between different school districts. Id. at 351, 488 S.E.2d at 257. Thus, while there is a right to this basic educational opportunity, the court was careful to circumscribe its limits.

In sousing out the right to a sound basic education from general inequality claims, the court concluded "that some of the allegations in the complaints of plaintiff-parties state claims upon which relief may be granted if they are supported by

_____

[4] In addition to listing a non-exclusive list of factors to potentially consider when evaluating educational adequacy, Leandro emphasized that courts are poorly equipped to address the intensive question of what qualifies as a sound basic education:

> [W]e reemphasize our recognition of the fact that the administration of the public schools of the state is best left to the legislative and executive branches of government. Therefore, the courts of the state must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education. A clear showing to the contrary must be made before the courts may conclude that they have not. Only such a clear showing will justify a judicial intrusion into an area so clearly the province, initially at least, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education.

Leandro, 346 N.C. at 357, 488 S.E.2d at 261.

substantial evidence" and consequently remanded those claims. Id. at 355, 488 S.E.2d at 259. It held that denial of a sound basic education would constitute "a denial of a fundamental right" and move the inquiry to a strict scrutiny standard. Id. at 357, 488 S.E.2d at 261.

Further, when assessing constitutional claims, sovereign immunity does not trump constitutional redressability; rather, if a constitutional violation occurs, individuals may "seek to redress" it, irrespective of whether sovereign immunity would generally apply. Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 342, 678 S.E.2d 351, 357 (2009).

Craig v. New Hanover County Board of Education, 363 N.C. 334, 678 S.E.2d 351 (2009), addresses this situation where the plaintiff's common law claim was barred by sovereign immunity. Id. at 338, 678 S.E.2d at 354. The question was whether that remedy was an adequate remedy at state law so as to preclude his constitutional claim. Id., 678 S.E.2d at 354. He had asserted state constitutional claims under article I, sections 15 and 19 and article IX, section 1. Id. at 335, 678 S.E.2d at 352 (all premised on a sexual assault committed against the plaintiff).

The application of sovereign immunity meant that, because his common law claims were barred, if he was not allowed to sue directly under the constitution, he would be deprived of any remedy. Id. at 340, 678 S.E.2d at 356. The court cited favorably

-22-

that "[i]t would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity." Id. at 339, 678 S.E.2d at 355 (citing Corum v. Univ. of N.C., 330 N.C. 761, 785-86, 413 S.E.2d 276, 291-92 (1992)) (emphasis removed)). The court concluded that on these facts, the plaintiff's alternative remedy was not sufficiently adequate, given the application of sovereign immunity, and allowed him to bring his constitutional claims. Id. at 339-40, 678 S.E.2d at 355-56. ("[P]laintiff may move forward in the alternative, bringing his colorable claims directly under our State Constitution based on the same facts . . . ."). Thus, while this case holds that "sovereign immunity could not operate to bar direct constitutional claims," id. at 340, 678 S.E.2d at 356, it does not appear to articulate an independent basis for the creation of such a constitutional claim.

The North Carolina Court of Appeals interprets Craig similarly in Doe v. Charlotte-Mecklenburg Board of Education, 222 N.C. App. 359, 731 S.E.2d 245 (2012). There, the court cautions that "[t]he mere fact that Plaintiff has asserted that certain of her claims are 'constitutional' in nature does not

-23-

automatically mean that she has stated one or more valid constitutional claims." Id. at 365, 731 S.E.2d at 249. It emphasized that courts must evaluate the validity of constitutional claims because otherwise plaintiffs could "simply re-label claims that would otherwise b[e] barred on governmental immunity grounds as constitutional in nature." Id., 731 S.E.2d at 249. Consequently, Doe limits Craig to its holding "that the existence of common law claims that were barred by the doctrine of sovereign or governmental immunity did not operate to bar the plaintiff from attempting to assert any constitutional claims that he might have otherwise had against the defendant . . . ." Id. at 367, 731 S.E.2d at 251 (emphasis added) (citation omitted). The application of both these cases shows that, per Craig, while a claim should not be left utterly without a remedy because of sovereign immunity if a constitutional cause of action exists to redress it, that action must actually exist under the constitution, per Doe, and cannot be an artificial

attempt to create a constitutional claim out of thin air to
bypass the limits of sovereign immunity.[5]

As to the substance of the constitutional claims at issue,
Doe states: "To date, we are not aware of any decision by either
[the North Carolina Court of Appeals] or the [North Carolina]
Supreme Court which has extended the educational rights
guaranteed by N.C. Const. art. I, § 15 and N.C. Const. art. IX,
§ 1, beyond matters that directly relate to the nature, extent,
and quality of the educational opportunities made available to
students in the public school system." Doe, 222 N.C. App. at
370-71, 731 S.E.2d at 252-53. (emphasizing the lack of a "state
constitutional right to recover damages from local boards of
education for injuries sustained as the result of a negligent
failure to remain aware of and supervise the conduct of public
school employees").

Two federal decisions favor this interpretation as well:
Fothergill v. Jones County Board of Education, 841 F. Supp. 2d
915 (E.D.N.C. 2012), and Collum v. Charlotte-Mecklenburg Board

---

[5] Doe analyzed whether the plaintiff had "stated a claim for
relief based upon the relevant provisions of the state
constitution," regardless of the immunity dynamic, to determine
whether the underlying claims had sufficient merit to proceed.
Id. at 365, 731 S.E.2d at 249. The court specifically addressed
Craig when establishing the proper line of inquiry, emphasizing
that in Craig "the Supreme Court simply declined to consider the
substantive viability of the state constitutional claims that
the plaintiff attempted to assert . . . ." Doe, 222 N.C. App. at
367, 731 S.E.2d at 250-51 (citation omitted).

of Education, No. 3:07cv534-RJC-DSC, 2010 WL 702462 (W.D.N.C. Feb. 23, 2010).

Fothergill addresses a proposed constitutional claim under article I, section 15 and another provision and deems it "a step too far" to "assert that the North Carolina Supreme Court has recognized a private right of action for monetary damages" in Craig. Fothergill, 841 F. Supp. 2d at 918 (citation omitted). Instead, and like Doe, Fothergill determines that "Craig expressly declined to rule on the merits of that constitutional claim," id., and classifies Craig as holding "that sovereign immunity cannot bar direct constitutional claims[,]" rather than "opining on whether Craig's claim was cognizable under the North Carolina Constitution." Id. at 919. Fothergill ultimately holds that there was no state law basis for a state constitutional right claim based on sexual abuse and thus, as a federal court, it did not have the authority to "create or expand a State's public policy." Id. (citation omitted).

Collum similarly limits Craig to its sovereign immunity holding, reemphasizing that Craig "did not . . . recognize a private right of action for denial of the right to the privilege of education under the North Carolina Constitution." 2010 WL 702462, at *2. In keeping with existing precedent regarding the North Carolina educational guarantee, Collum further articulates that "no North Carolina Court has recognized a private right of

-26-

action for the denial of the right to the privilege of education." Id. at *3.

This analysis also accords with later North Carolina decisions and interpretations.[6] For example, Mack v. Board of Education of Public Schools of Robeson County, No. COA13-51, 2013 WL 3379683 (N.C. Ct. App. July 2, 2013), describes Doe as maintaining the limited scope of the constitutional guarantee to the nature, extent, and quality of educational opportunities, rather than providing a private right of action for negligence by the board in supervising public school employees. Id. at *3 (citation omitted). Mack itself addresses a claim brought under article I, section 15, and holds that

> [j]ust as the Doe court found that the plaintiff had no constitutional right to recover damages for injuries sustained as a result of a negligent failure to remain aware of and supervise the conduct of public school employees, we find no constitutional right for plaintiffs to recover from defendant for injuries

---

[6] In keeping with this judicial trend, Frye v. Brunswick County Board of Education, 612 F. Supp. 2d 694 (E.D.N.C. 2009), applies the clear rule that "[g]overnmental immunity does not apply to plaintiffs' North Carolina constitutional claims." Id. at 704 (citation omitted). It then uses Craig to discuss when "a direct claim under the North Carolina constitution is available" — that is, "only 'in the absence of an adequate state remedy.' " Id. (citation omitted). It further observes the state classification of an adequate remedy as "an 'available, existing, applicable,' but not necessary successful, remedy. Id. (citations omitted). However, the plaintiff's mere failure to state a claim upon which relief may be granted was sufficient to obviate the need for the court's analysis of adequate state remedy doctrine. Id.; see also Collum, 2010 WL 702462, at *3 (applying Frye).

<u>sustained from a failure to remain aware of and supervise
the conduct of other public school students.</u>

<u>Id.</u> (emphasis added).[7]

<u>R.W. v. Wake County Public Schools</u>, No. 5:07-CV-136-F3,
2010 WL 3452376 (E.D.N.C. Sept. 1, 2010), also specifically
addresses claims brought under article I, section 15 and article
IX, section 2. <u>Id.</u> at *5. There, the insufficient factual
allegations emphasized failures to aid his numerous learning
disabilities and described his IEP as falsified and inaccurate.
<u>Id.</u> at *2. Consequently, his claim fails to state a claim upon
which relief may be granted. <u>Id.</u> at *2, 6 (claim alleged "
'Violation of the NC Constitution [sic] Right to Equal Access to
a Sound Public Education,' seeking compensatory damages for
R.W.'s loss of earning capacity, out-of-pocket expenses,
personal humiliation, and mental anguish").

Based on this landscape, this court will find that
Plaintiff similarly fails to allege his claim adequately and
thus dismissal is proper.

Initially, <u>Leandro</u> is distinguishable from Plaintiff's case
as he does not allege general inequities; rather, he alleges

---

[7] However, these "[p]laintiffs presented no evidence of any
actions by defendant which impacted the 'nature, extent, and
quality of the educational opportunities made available to
students in the public school system,' and thus plaintiffs'
constitutional claim fails as a matter of law." <u>Mack</u>, 2013 WL
3379683, at *3 (citation omitted).

specific violations against him individually and his educational plan (IEP). To the extent his claim is premised on Defendants' failure to protect him from other students' physical assault, Mack establishes that his claim lacks a state constitutional basis. The question of sovereign immunity is irrelevant, even if there is no other basis for his claim, because a constitutional basis itself must exist, in some shape or form, for him to be able to move forward. See, e.g., Collum, 2010 WL 702462, at *3. Here, precedent does not suggest that his particular factual basis is sufficient.

However, Plaintiff also premises his constitutional claims on the impact to his education itself and his IEP from his move to homebound education for the remainder of the school year. (Compl. (Doc. 3) ¶¶ 122-36.) Arguably, his factual allegations "describe a course of conduct which directly relates to the nature, extent, and quality of the educational opportunities made available to [him] while he was a student at Southeast Guilford High School." (Br. in Opp'n (Doc. 21) at 4.) Plaintiff claims that his physical exclusion from campus following the assault "necessarily had a negative impact on the extent of educational opportunity afforded him," and he further points to potential specific statutory violations to show violations of his right to the opportunity to an education. (Id.) It is therefore this question of a direct relation to the nature,

-29-

extent, and quality of the educational opportunities made available to Plaintiff that guides the analysis of his remaining allegations. See Doe, 222 N.C. App. at 370-71, 731 S.E.2d at 252-53; (Br. in Opp'n (Doc. 21) at 5.)

The qualitative right to the opportunity for a sound basic education is not a right to a perfect or flawless education. See Leandro, 346 N.C. at 346-48; 488 S.E.2d at 254-56; cf. B.W. ex rel. Webster v. Durham Pub. Schs., No. 1:09CV00970, 2012 WL 2344396, at *9 (M.D.N.C. June 20, 2012).[8] Rather, what the North Carolina Constitution protects is the opportunity to receive a sound basic education. See Ryan ex rel. Watson-Green v. Wake Cty. Bd. of Educ., No. COA09-530, 2010 WL 4069158, at *12 (N.C. Ct. App. Oct. 19, 2010); Banks v. Cty. of Buncombe, 128 N.C. App. 214, 222-23, 494 S.E.2d 791, 796-97 (1998). Illustratively, the mere fact that a student has had to engage in an alternative education program, such as when due to disciplinary issues, is

---

[8] Illustratively, in the school discipline context, the North Carolina Supreme Court addressed the interaction between the right to a sound basic education and alternative education. The court found a statutory right to alternative education but "stress[ed] that a fundamental right to alternative education does not exist under the state constitution." King ex rel. Harvey-Barrow v. Beaufort Cty. Bd. of Educ., 364 N.C. 368, 372, 704 S.E.2d 259, 261 (2010). It also distinguished Leandro, which focused on funding differences in low-income districts, from "the state offering all students a sound basic education but temporarily removing students who engage in misconduct that disrupts the sound basic education of their peers." Id. at 374, 704 S.E.2d at 263.

-30-

insufficient to establish a constitutional violation; instead, a plaintiff must show that the program itself was somehow inadequate to provide the opportunity for a sound basic education. Ryan, 2010 WL 4069158, at *12 (considering the types of courses offered in the alternative education program in the inquiry of whether a sound basic opportunity was available).

However, Plaintiff's status as a student with a learning disability and an IEP raises this inquiry. While he had only the right to the opportunity to a sound basic education, the question remains whether his opportunity was unconstitutionally infringed upon. Plaintiff's allegations that the IEP team was not present for the meeting determining his educational steps following the assault is troubling, given state statutory requirements. As Plaintiff's actual ability to engage in schooling may have been affected by this behavior, further analysis is necessary to determine the sufficiency of his claim. Cf. Fothergill, 841 F. Supp. 2d at 918 ("[O]nly those fundamental aspects of a sound basic education listed [in Leandro] have been cognizable in North Carolina state courts to date.").

Physical exclusion alone cannot be enough, given decisions in the alternative education context. However, clarity eludes this court when seeking to draw a clean parallel to Plaintiff when scouring the applicable case law.

-31-

Further muddying this issue is this court's status not only as a judicial body less equipped to address these issues than legislatures, see Leandro, 346 N.C. at 354-55, 488 S.E.2d at 259, but also as a federal court seeking to apply a proper interpretation of the North Carolina Constitution. Cf. S. Dairies v. Cooper, 35 F.2d 439, 442 (4th Cir. 1929) ("We are bound, of course, by the interpretation placed upon a state statute by the courts of the state itself . . . ."). Thus, given the lack of clarity, and the fact that there is no specific example of a North Carolina court "recogniz[ing] the right and remedy that plaintiffs advance in their complaint, this federal court will not create such a right of action." Frye, 612 F. Supp. 2d at 707 (citation omitted). In keeping with guidance from the Fourth Circuit, "a federal court 'should not create or expand [a] State's public policy[,]' [and] . . . '[a]bsent a strong countervailing federal interest, the federal court . . . should not elbow its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law.'" Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (citations omitted).

Consequently, this court cannot find that the North Carolina Constitution envelopes Plaintiff's alleged grievances under the guarantee to the opportunity for a sound basic

-32-

education. Thus, this court will grant Defendants' motion with
respect to Plaintiff's first claim.[9]

## B. **ADA Claims**

Plaintiff alleges two claims under the ADA: (1) Count Four,
"Failure to Adequately Response to Bullying under 42 U.S.C. §
12132," (Compl. (Doc. 3) at 31), and (2) Count Five, "Failure to
Make Reasonable Accommodations for a Disabled Child under 42
U.S.C. 12132," (Id. at 34).

---

[9] This analysis is complicated by the parties raising the
question of whether Plaintiff's alternative remedies matter to
the question of whether he is entitled to a constitutional
remedy. Essentially, if this action pushing him towards
homebound education did interfere with his right to the
opportunity for a sound basic education, do these other options,
including special education placement statutes, negligence, and
disciplinary review, provide sufficient alternative remedies to
preclude a constitutional remedy? (See Reply Br. (Doc. 23) at 3-
4.) However, if no constitutional right can be said to exist to
begin with, the adequate alternative remedy inquiry is moot:

> [This] Court finds Craig [and its discussion of
> alternative remedies] inapposite to the issue at bar. As
> Frye makes clear, no North Carolina Court has recognized
> a private right of action for the denial of the right to
> the privilege of education. Further, plaintiff's remedy
> is adequate because "to be considered adequate in
> redressing a constitutional wrong, a plaintiff must have
> at least the opportunity to enter the courthouse doors
> and present his claim." The plaintiff[] ha[s] had the
> opportunity to enter the courthouse doors and present
> [his] constitutional claim, and the Court, after
> considering the pleadings, holds that they have failed
> to state a claim upon which relief may be granted.

Collum, 2010 WL 702462, at *3 (emphasis added) (citations
omitted).

-33-

Defendants urge this court to dismiss those counts as filed outside of the statute of limitations. (Mem. in Supp. (Doc. 7) at 13.) In the Fourth Circuit, because there is no congressionally provided statute of limitations under Title II of the ADA, courts instead use the statute of limitations from the most analogous state law claim. (Id. at 13-14 (citations omitted).) In North Carolina, the analogous statute provides for a two-year statute of limitations. (Id. at 14 (citing Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 699 (M.D.N.C. 2013)).) Thus, Defendants assert that the statute of limitations ran on September 13, 2014, six months before Plaintiff filed his complaint, (id.),[10] and Plaintiff's fourth and fifth claims should be dismissed as time-barred. (Id. at 15.)

Conceding that "the applicable statute of limitations on an ADA claim arising from a non-employment context in North Carolina is two years," (Br. in Opp'n (Doc. 21) at 11 (citing Mary's House, 976 F. Supp. 2d at 699), Plaintiff argues that the applicable statute of limitations is three years due to

---

[10] Although Plaintiff filed a previous complaint on September 18, 2013, within the applicable period, Defendants argue that he "never raised any cause of action under Title II of the ADA" in it. (Mem. in Supp. (Doc. 7) at 14-15 (arguing further that, "[e]ven if he had, the current suit was filed more than one year after the Plaintiff took a voluntary dismissal of the first complaint).)

-34-

Blanchard's status as a public official under North Carolina law. (Id.)[11] He further emphasizes the state's heightened interest in allowing citizens to redress rights potentially violated by state actors. (Id. at 11-12.) Most notably, however, Plaintiff does not cite a single case in favor of his proposed three-year statute of limitations.

In reply, Defendants reject Plaintiff's novel argument. (Reply Br. (Doc. 23) at 5.) They argue that the rule is clear, as "the most analogous statute to the ADA is the North Carolina Persons with Disabilities Act" ("a specific statute directly on point") and it provides for a two-year limit. (Id. at 5-6.) Further, they distinguish Plaintiff's "public officer trespass statute of limitations [a]s completely unrelated to the ADA claims," (id. at 6), most specifically because of Plaintiff's failure to allege a trespass against his person or property. (Id. (emphasizing his allegations of deliberate indifference and failure to make reasonable accommodations).) Because the North Carolina Supreme Court defined trespass for the purposes of this claim and specifically provided that "the statute does not and

_____

[11] Plaintiff further asserts that the statute of limitations was tolled in this case until he reached the age of majority on September 13, 2012, making the three-year limit he advocates expire on September 13, 2105, six months after the case was filed on March 19, 2015. (Id. at 12.) Thus, he argues that the motion to dismiss these counts should be denied. (Id.)

-35-

was never intended to apply to a breach of official duty in reference to the principal and employer — in this case the municipality," Defendants reject its applicability. (<u>Id.</u> at 6-7 (internal quotation marks omitted) (emphasis removed) (citing <u>Fowler v. Valencourt</u>, 334 N.C. 345, 348-49, 435 S.E.2d 530, 532 (1993) (construing the statutory predecessor of N.C. Gen. Stat. §§ 1-54(1), 1-52(13))).)

Defendants further argue that even if the trespass statute of limitations could apply and the two options conflicted, precedent establishes that the Persons with Disabilities Act is the most analogous and controlling statute and thus its statute of limitations trumps any other option. (<u>Id.</u> at 7.) After attacking Plaintiff's attempts to distinguish his case, Defendants reiterate that Plaintiff's inability to cite cases in support of his interpretation, as "[a]ll of the relevant case law . . . centers around claims regarding a police officer's alleged use of force and/or false imprisonment." (<u>Id.</u> at 8.) Forcefully claiming that Plaintiff's attempt to fashion a three-year statute of limitations uses an irrelevant general statute, Defendants urge that his claims be dismissed as time-barred. (<u>Id.</u>)

A statute of limitations defense is characterized as "an affirmative defense, which can be the basis of a motion to dismiss under Rule 12(b)(6)." <u>Dickinson v. Univ. of N.C.</u>, 91 F.

Supp. 3d 755, 763 (M.D.N.C. 2015) (citation omitted). For it to

be granted "at this stage, all facts necessary to show the time

bar must clearly appear 'on the face of the complaint.' " Id.

(citation omitted).

As laid out in Mary's House, Inc. v. North Carolina, 976 F.

Supp. 2d 691 (M.D.N.C. 2013):

> Neither Title II of the ADA nor section 504 of the
> [Rehabilitation Act] has a specific limitations period,
> so the Fourth Circuit has borrowed the state statute of
> limitations for the most analogous state law claim. For
> North Carolina, that statute is the Persons with
> Disabilities Protection Act, N.C. Gen. Stat. § 168A,
> which includes a two-year statute of limitations for
> non-employment related actions.

Id. at 699 (citations omitted); see also McCullough v. Branch

Banking & Tr. Co., 35 F.3d 127, 130 (4th Cir. 1994) (deeming

N.C. Gen. Stat. § 168A "the most analogous statute to the

Rehabilitation Act"); Short v. North Carolina, 1:15-CV-44-GCM-

DSC, 2016 WL 146532, at *3 (W.D.N.C. Jan. 12, 2016); Dickinson,

91 F. Supp. 3d at 763; Green v. Cafe, No. 4:04-CV-111-H(2), 2008

WL 7871053, at *5 (E.D.N.C. Nov. 5, 2008).

Thus, the key issue is the legitimacy of Plaintiff's

argument that the clearly established two-year statute of

limitations does not apply. His argument invokes the three-year

statute of limitations for actions "[a]gainst a public officer,

for a trespass, under color of his office." N.C. Gen. Stat. § 1-

52(13). Dunn v. Town of Emerald Isle, No. 89-1829, 1990 WL

-37-

180977 (4th Cir. Dec. 6, 1990), finds controlling the definition

of trespass in a North Carolina Supreme Court case:

> "in its more general sense a trespass is sometimes said
> to include any wrongful invasion of the rights of
> another; but in its more natural and usual meaning it is
> properly restricted to unlawful acts done to the person
> or property of another by violence or force direct or
> imputed."

Id. at *7-8 (citing Brown v. Walker, 188 N.C. 52, 58, 123 S.E.

633, 636 (1924)); Fowler v. Valencourt, 334 N.C. 345, 348-49,

435 S.E.2d 530, 532 (1993) (citing Brown, 188 N.C. at 58, 123

S.E. at 636) (incorporating Brown's definition of trespass). The

claim at issue in Dunn, libel, did not qualify under the

trespass statute, as there was no allegation of violence or

force. Dunn, 1990 WL 180977 at *8.

Similarly, the seminal case, Brown v. Walker, 188 N.C. 52,

123 S.E. 633 (1924), addresses a financial issue and holds that

the previous version of the trespass statute "d[id] not, and was

never intended to, apply to a breach of official duty in

reference to the principal and employer, in this case the

municipality." Id. at 58, 123 S.E. at 636. Having defined

trespass as "committed by a public officer under color of his

office and constituting a wrongful invasion of the rights of

third persons by force shown or imputed," the court determines

-38-

that a narrowed scope is appropriate and trespass should not be broadly construed. See id.[12]

---

[12] Additionally of note is the fact that, in addition to Plaintiff's failure to cite any case law in support of his argument to apply the three-year § 1-52 statute of limitations, a search of the citing references of § 1-52 limited to "ADA" illustrates just how unique his claim is. One sufficiently relevant case from this search, McCullough v. Branch Banking & Tr. Co., 35 F.3d 127 (4th Cir. 1994), addresses the applicable statute of limitations for the Rehabilitation Act. The Fourth Circuit identifies N.C. Gen. Stat. § 168A-2 as "an act which protects disabled individuals from discrimination" in North Carolina, intended to serve as "a counterpart to the Rehabilitation Act." Id. at 130. There, the plaintiff "argue[d] that his claim [wa]s more analogous to a general wrongful discharge cause of action, which for statute of limitations purposes is treated as a personal injury claim with a three-year limitations period." Id. at 131 (citations omitted). However, McCullough focuses on whether the North Carolina Act or a more general wrongful discharge act is more analogous to the Rehabilitation Act. Id. at 132. Notably, the focus is not on § 1-52 itself; rather, § 1-52 simply provides the statute of limitations for the broader wrongful discharge statute. Thus, McCullough is similarly distinguishable on a number of grounds, particularly in that its plaintiff only used § 1-52 in proxy to its relationship to another more specific piece of legislation rather than to the nebulous concept of a trespass advanced by Plaintiff here.

Even further working against Plaintiff's argument is the fact that part of McCullough's reasoning belies the policy support Plaintiff seeks to lend his claim — that legislators would want longer statutes of limitation when addressing public officials' conduct. (Br. in Opp'n (Doc. 21) at 11-12.) The Fourth Circuit specifically observes that "a short statute of limitations is not uncommon among federal civil rights statutes[.]" McCullough, 35 F.3d at 131 (discussing the employment context). While this does not directly address Plaintiff's claim, it lends support to the proposition that a short statute of limitations, even in an arena as fraught with vulnerable plaintiffs as civil rights law, is not necessarily in opposition to legislative intent.

-39-

Consequently, the applicable statute of limitations for Plaintiff's ADA claims is two years. Plaintiff reached the age of majority on September 13, 2012, (Compl. (Doc. 3) ¶¶ 20-21), so the two-year statute of limitations expired on September 13, 2014. Because Plaintiff originally filed his complaint in state court on March 2, 2015, (Notice of Removal, Ex. A (Doc. 1-1) at 47), this court will grant Defendants' motion to dismiss these counts, as the time bar is apparent on the face of Plaintiff's complaints.

## C.  **Punitive Damages**

Plaintiff also includes punitive damages in his demand for relief. (Compl. (Doc. 3) at 45.)

Defendants argue that this court lacks subject-matter jurisdiction to award punitive damages because "[p]unitive damages pursuant to claims brought under state or federal law

_____

As a note, <u>Lewis v. North Carolina Agricultural and Technical State University</u>, No. 1:09CV724, 2010 WL 1630814 (M.D.N.C. Apr. 21, 2010), uses § 1-52(5) – the provision for personal injury actions – to provide a three-year statute of limitations for a § 1983 action "for disability discrimination." <u>Id.</u> at *5. Two key differences sufficiently distinguish it from Plaintiff's argument: (1) Plaintiff specifically is bringing suit under the ADA in the claims at issue here, not under § 1983, and (2) Plaintiff seeks to invoke a different provision under § 1-52(13) for trespass. <u>Sheaffer v. County of Chatham</u>, 337 F. Supp. 2d 709 (M.D.N.C. 2004), does the same thing, applying § 1-52(5) (personal injury actions) as the applicable statute of limitations for § 1983 claims. <u>Id.</u> at 717. These cases are both sufficiently distinguishable, in keeping with <u>McCullough</u>, for the reasons discussed <u>supra</u>.

are not available against governmental entities." (Mot. to Dismiss (Doc. 6) at 2.) Specifically, Defendants assert that for federal claims, "municipalities are immune from punitive damages under 42 U.S.C. § 1983" unless there is a statutory exemption, (Mem. in Supp. (Doc. 7) at 15 (internal quotation marks and alterations omitted) (citations omitted)), and state law claims have the same immunity. (Id. at 16 (citation omitted).) Because the board is a governmental and political entity and there is no exception providing for punitive damages against it, Defendants move to dismiss Plaintiff's request. (Id.)

In response, Plaintiff distinguishes his case from the presumption against punitive damages for governmental entities by arguing that state law nevertheless permits punitive damages here because the board of education is a "corporate body," not a typical government entity, and thus the general prohibitions do not apply. (Br. in Opp'n (Doc. 21) at 12.) Additionally, he urges that the Board could purchase liability insurance that could cover punitive damages awards against the Board. (Id.)

Plaintiff concedes that punitive damages would not be available for his ADA claims but urges that they are possible for his malicious prosecution and intentional infliction of emotional distress claims (which are presented in counts two and three of his Complaint, (Compl. (Doc. 3) at 26, 27)), and his

claim directly under the state constitution. (Br. in Opp'n (Doc. 21) at 13.)

Defendants' reply attacks the validity of Plaintiff's classification of the Board as a unique government entity and cites a number of cases in support. (Reply Br. (Doc. 23) at 8-9 (citations omitted).) They seek to obviate Plaintiff's allegations about the Board's insurance coverage, arguing that insurance coverage is irrelevant to the justification for the prohibition on punitive damages against government entities. (Id. at 9.)[13] They then attack Plaintiff's suggestion that Leandro "left open the door to punitive damages," by asserting that Plaintiff seeks to over-interpret the relief Leandro left available "in contravention to well established case law" and that no "federal or state statutory exception specifically allowing for punitive damages" exists in this case. (Id. at 9-10.)

Municipalities are generally immune from punitive damages. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981)); Long v. City of Charlotte, 306 N.C. 187, 208, 293 S.E.2d 101, 115 (1982). Punitive damages are similarly

---

[13] In a footnote, Defendants characterize Plaintiff's arguments about the potential for the Board's insurance coverage to cover punitive damages as "[h]ighly unlikely and not ple[]d within the body of the Plaintiff's Complaint." (Reply Br. (Doc. 23) at 9 n.2.)

-42-

unavailable for ADA violations. <u>Constantine v. Rectors &</u> <u>Visitors of George Mason Univ.</u>, 411 F.3d 474, 498 n.16 (4th Cir. 2005) (citation omitted). Overall, there is an underlying "presumption against imposition of punitive damages on governmental entities." <u>Vt. Agency of Nat. Res. v. United</u> <u>States</u>, 529 U.S. 765, 784 (2000) (citation omitted).[14]

Consequently, the inquiry here is whether Plaintiff's argument that Defendant actually is not a municipality, and thus the punitive damages immunity is inapplicable, is valid. (<u>See</u> Br. in Opp'n (Doc. 21) at 13.)

"The board of education of each county in the State shall be a body corporate . . . ." N.C. Gen. Stat. § 115C-40. Among other powers, this renders a board capable of defending the corporation in court. <u>Id.</u> Further, boards are able to purchase liability insurance. <u>See</u> N.C. Gen. Stat. § 115C-42. This purchase would waive the Board's immunity "but such immunity is

---

[14] Illustratively, <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981), extensively elaborates about why punitive damages are inappropriate and ineffective when applied against a municipality (and, in reality, the taxpayers), versus when applied against a typical defendant. <u>See generally</u> <u>id.</u>

-43-

waived only to the extent that said board of education is indemnified by insurance for such negligence or tort." Id.[15]

Despite their classification as a body corporate, courts have held that boards are generally immune from punitive damages. See Barrett v. Bd. of Educ. of Johnston Cty., N.C., 13 F. Supp. 3d 502, 515 (E.D.N.C. 2014) (determining that "[n]o statutory exception permits an award against the Board . . . so the Board is immune from punitive damages here"); J.W. v. Johnston Cty. Bd. of Educ., No. 5:11-CV-707-D, 2012 WL 4425439, at *17 (E.D.N.C. Sept. 24, 2012) (holding that "[t]he Board cannot be liable for punitive damages" (citations omitted)); N.C. Motorcoach Ass'n v. Guilford Cty. Bd. of Educ., 315 F. Supp. 2d 784, 810 (M.D.N.C. 2004) ("Defendant Guilford County Board of Education is a governmental entity and therefore is immune from punitive damages." (citation omitted)); Long v. City

---

[15] The law provides in full:

> Any board of local education, by securing liability insurance as hereinafter provided, is hereby authorized and empowered to waive its governmental immunity from liability for damage by reason of death or injury to person or property caused by the negligence or tort of any agent or employee of such board of education when acting within the scope of his authority or within the course of his employment. Such immunity shall be deemed to have been waived by the act of obtaining such insurance, but such immunity is waived only to the extent that said board of education is indemnified by insurance for such negligence or tort.

N.C. Gen. Stat. § 115C-42.

-44-

of Charlotte, 306 N.C. 187, 208, 293 S.E.2d 101, 115 (1982) (holding that "in the absence of statutory provisions to the contrary, municipal corporations are immune from punitive damages"); Ripellino v. N.C. Sch. Bds. Ass'n, 158 N.C. App. 423, 431, 581 S.E.2d 88, 94 (2003) ("In Long, our Supreme Court held that public policy, in the absence of statutory provisions to the contrary, provides that municipal corporations are immune from punitive damages." (citations omitted)). Thus, to the extent that Plaintiff argues that punitive damages may be available solely by virtue of the Board's unique characteristics as a corporate entity, his argument is largely without merit.

Plaintiff argues further, however, that Defendants purchased insurance and thus, to the extent it exists, they waive liability. See N.C. Gen. Stat. § 115C-42.

The North Carolina Court of Appeals explored this issue in the board-of-education context in Magana v. Charlotte-Mecklenburg Board of Education, 183 N.C. App. 146, 645 S.E.2d 91 (2007). Magana explicitly states that "[o]ur courts have strictly construed N.C.G.S. § 115C-42 against waiver," and "immunity is waived only to the extent of the coverage obtained

-45-

under an insurance policy." Id. at 149, 645 S.E.2d at 92-93 (citation omitted).[16]

"[T]o overcome a defense of [sovereign] immunity, the complaint must specifically allege a waiver of [sovereign] immunity. Absent such an allegation, the complaint fails to state a cause of action." Hinson v. City of Greensboro, 753 S.E.2d 822, 827 (N.C. Ct. App. 2014) (internal quotation marks omitted) (alterations in original) (citation omitted); see also Fabrikant v. Currituck Cty., 174 N.C. App. 30, 38, 621 S.E.2d 19, 25 (2005) ("This requirement does not, however, mandate that a complaint use any particular language." (citations omitted)).

Further, because "su[ing] a public officer in his official capacity . . . is equivalent to a suit against the state," where the state has not waived immunity or consented to suit, neither can suit be had against the officer sued in his official capacity. Green v. Kearney, 203 N.C. App. 260, 270, 690 S.E.2d 755, 763 (2010). Additionally, the same logic applies in the inverse: where the sovereign has waived immunity, suit may be had against the official sued in his official capacity. See

_____

[16] In Magana, because the Board had both an excess policy — where the Board had to pay a specified sum to the claimant before the insurance policy would take effect — and "statutory immunity from liability from tort claims," the policy failed to provide any indemnification whatsoever because the Board could not be required to pay the preliminary specified sum. 183 N.C. App. at 149, 645 S.E.2d at 93.

<u>Clayton v. Branson</u>, 153 N.C. App. 488, 493, 570 S.E.2d 253, 257 (2002) ("An officer acting in his official capacity shares the municipalities['] immunity or waiver." (citation omitted)). Specifically, an official's immunity is waived "to the extent of the insurance coverage" purchased by the co-defendant city. <u>Id.</u>, 570 S.E.2d at 257.

Here, Plaintiff specifically alleges that "Defendant Board has waived sovereign immunity by the purchase of insurance under N.C. Gen. Stat. § 115C-42." (Compl. (Doc. 3) ¶ 36.) The second and third claims for relief include Blanchard as a defendant in his official capacity, (<u>id.</u> ¶¶ 260, 273), and thus his immunity status mirrors that of the Board. Because Plaintiff specifically alleges that there has been a waiver and, presuming this allegation to be true given the posture of the case, the Board waived immunity to the extent of its insurance coverage, Defendants' motion with respect to punitive damages in the request for relief should be denied. In the future, however, should Defendants establish the amount of the insurance policy

-47-

or its inapplicability to punitive damages, it is likely that waiver would not exist.[17]

IV.  <u>**CONCLUSION**</u>

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. 6) is **GRANTED IN PART**, as to Plaintiff's first, fourth and fifth claims, and **DENIED IN PART**, as to Plaintiff's inclusion of punitive damages.

This the 29th day of March, 2016.

_____
United States District Judge

---

[17] Defendants respond to Plaintiff's allegation of potential coverage even as to punitive damages with the following: "Not that it matters anyway, but in his brief, Plaintiff states '[s]uch insurance may include coverage from punitive damages for which The Board could become liable.' Highly unlikely and not ple[]d within the body of Plaintiff's Complaint." (Reply Br. (Doc. 23) at 9 n.2.) While Plaintiff's complaint is more general in its allegation of waiver-by-purchase-of-insurance, it does specifically invoke insurance and the applicable state law provision. (<u>See</u> Compl. (Doc. 3) ¶ 36.) Further, while Plaintiff does not specifically allege coverage for punitive damages, versus damages in general, "precise language alleging that the state has waived the defense of sovereign immunity is not necessary." <u>Fabrikant v. Currituck Cty.</u>, 174 N.C. App. 30, 38, 621 S.E.2d 19, 25 (2005).

-48-